Eastern District of Kentucky
FILED
JAN 18 2018
AT ASHLAND
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHER DIVISION
ASHLAND

**Civil Action No. 14-107-HRW**

**MICHAEL COLEMAN,**                                                                **PLAINTIFF,**

v.                 **MEMORANDUM OPINION AND ORDER**

**NORFOLK SOUTHERN RAILWAY COMPANY,**                 **DEFENDANT.**

This matter is before the Court upon Defendant Norfolk Southern Railway Company's Motion for Partial Summary Judgment Seeking Dismissal of Plaintiff's Claims under the Locomotive Inspection Act, 49 U. S. C.§ 20701 and claims asserting alleged violations of the federal regulations codified at 49 CFR § 229.45 and 49 CFR § 229.119( c). [Docket No. 39]. The matter has been fully briefed by the parties [Docket Nos. 39-1, 40, 43, 66, and 68]. For the reasons stated herein, the Court finds that Plaintiff Michael Coleman has not come forward with any credible evidence creating a genuine issue of material fact that locomotive NS 6729 was in use on the Railroad's line of road at the time of his alleged slip on an exterior walkway of the locomotive on January 22, 2014 and has provided no admissible evidence creating a genuine issue of material fact to support his contention that NSRC violated the provisions of the Federal Locomotive Inspection Act, 49 U.S.C. § 20701, or the federal regulations codified at 49 CFR § 229.45 and 49 CFR § 229.119( c). Therefore, the Plaintiff's claims against NSRC under the Locomotive Inspection Act and the provisions of the federal regulations promulgated at 49 CFR § 229.45 and 49 CFR § 229.119 ( c) which are set forth in Paragraphs 17 (j) -17 (n) of Plaintiff's Complaint will be dismissed as a matter of law.

**I.**

This case arises from injuries sustained by Plaintiff Michael Coleman on January 22, 2014 during his employment as a locomotive engineer with Defendant Norfolk Southern Railway Company ("NSRC").

The night before, on January 21, 2014, Plaintiff was called to report to work to Williamson Yard, West Virginia at 10:15 p.m. [Docket No. 40-5, Deposition of Michael Coleman at p.171]. His assignment that day was to be transported the NSRC siding at Burke, Kentucky and to move Train81K from Burke to the Defendant's yard in Bluefield, West Virginia. *Id.*

The trip from Williamson Yard to Burke, Kentucky is a 30 mile trip and crews are normally transported there by taxi cab. *Id.* at 189. However, on the evening of January 21, 2014, due to snowy and icy roadway conditions throughout the area, the use of taxi vehicles an engine, a J25 pusher unit, transported Plaintiff and Derek Erwin, a conductor, to the Burke Siding. *Id.* at 189. The pusher unit consisted of two light locomotives and was operated by Dwayne Moon.

Prior to the departure from Williamson Yard, Plaintiff and Moon requested that the J25 locomotive be cleared of ice and snow. *Id.* at 194,195,196. These tasks were subsequently performed by mechanical department roundhouse personnel. *Id.*

During this time, Plaintiff had a safety briefing with Trainmaster Finlen in Williamson Yard. *Id.* at 180. Plaintiff testified that "[w]e talked about the winter, you know, how it's cold outside and slick, and, you know, how snow is going to be an issue, watch your walkways and stuff. I asked them could they get somebody over there (Burke Siding) to clean the walkways off and he said no, you've got winter footwear, just to be careful and just don't – you know, don't

2

fall, do your exercises, and just be – be careful." *Id*. at 182,183. Further, Plaintiff testified that "we knowed it was snow covered" and "everything within 50 miles of Williamson was like that." *Id*.

It took about an hour and a half for the pusher engine unit to transport Plaintiff and Erwin from Williamson Yard to Burke, Kentucky. Plaintiff arrived at the Burke Siding sometime between 3:00 a.m. and 3:30 a.m on the morning of January 22, 2014. *Id*. at 236.

Plaintiff testified that when they arrived, he and Erwin dismounted to walk from the mainline track over to the lead locomotive of the 81K located on the siding track. *Id*. at 244.

In addition to 99 coal cars there were three locomotives in the 81K, two were running and the third locomotive was "dead in tow," which means it was not operating at all, and was being towed to a repair point. Plaintiff testified that the locomotives and their exterior passageways were snow covered when he and Erwin arrived. *Id*. at 248.

When Plaintiff got into the locomotive cab of the lead locomotive, NS 6706, he radioed Moon that he was on the NS 6706 and he had a reading from his EOT device. *Id*. at 253. He then turned on the headlights and proceeded to check the other two locomotive engines. *Id*. at 260.

Plaintiff planned to unlock the doors of the locomotive units and make certain that the handbrakes were off. *Id*. He was also going to make sure that the two lead locomotives were "on line." *Id*. at 261.

Plaintiff testified that as he was walking on the exterior engine platform from the second unit to the lead locomotive, after having released the handbrake on the second locomotive, the heel of the Altra Grip slipped off his left boot. He slipped and fell on the engine walkway

3

between the first and second units. *Id.* at 264.

When Plaintiff fell his left leg went down between the engine units and his right leg was still on the engine platform. *Id.* He felt "a pop" and pain in his right knee. *Id.* He told Erwin that he slipped. *Id.* Yet, he continued to work. He asked Erwin to release the handbrakes tying down the cars of coal so that the he could perform the continuity brake test and then be in a position to seek permission from the dispatcher for the train crew to move the three locomotives and railcars cars onto the Railroad's branch line and place the locomotives in service. *Id.* at 293.

At this point, Erwin safely dismounted the lead engine - NS 6706 - and walked back along the three locomotives to the railcars to release the handbrakes which were set on the railcars and had been securing them so that they were motionless. *Id.* at 317 and Docket No. 39-6, Deposition of Derek Erwin, p. 21.

After releasing all of the handbrakes securing the railcars, Erwin returned to and boarded the lead engine – the NS 6706.

Plaintiff then performed the continuity brake test and prepared to request approval from the NS Dispatcher to place the locomotives and railcars in service on the Railroad's line. *Id.* at 79.

After the continuity brake test was completed, Coleman moved the three locomotives and the 99 cars of coal a short distance along the Burke siding toward a switch which would have to be thrown before the crew could take the locomotives and the 99 cars of coal out of the siding. *Id.* at 320-321.

Before Plaintiff or Erwin were given permission to move the locomotives and the railcars from the siding onto the railroad's line of road, Plaintiff, at the behest of Erwin, decided to

4

report that he had been injured and to request that a supervisor be sent to the siding at Burke, Kentucky to assist him. *Id.* at 314-315 and Docket No. 39-6, Deposition of Derek Erwin, p. 25.

Plaintiff reported the injury over the radio to the chief dispatcher. *Id.* at 307, 308. He and Erwin were told to remain on the siding until their trainmaster arrived to assist Plaintiff and transport him for treatment and medical care if needed. [Docket No. 39-6, Deposition of Derek Erwin, p. 81]. Approximately an hour and a half passed from the time that Plaintiff slipped while conducting his inspection of NS 6729 until the time that he moved the train a short distance down the siding and then reported to his dispatcher that he had been injured.

After the dispatcher advised the crew that their trainmaster was on the way, Erwin dismounted the exterior steps of the lead locomotive, walked along the ballast adjacent to the locomotive engines and walkways to tie the handbrakes on the railcars. He then climbed back up on the third locomotive utilizing the exterior steps of the locomotive, tied the handbrake on the third locomotive, walked along the exterior walkway of the third locomotive to the walkway of the second locomotive, tied the handbrake on the second locomotive, and then traversed the walkway of the second locomotive without incident to the first locomotive to tie the handbrake on the lead locomotive. *Id.* at 83.

NSRC Trainmaster Flynn subsequently arrived at the siding at Burke, Kentucky and transported the Plaintiff to the hospital at Williamson where he was treated and released that same morning.

This lawsuit against NSRC followed, in which Plaintiff asserts claims under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*, the Locomotive Inspection Act, 49 U. S. C. § 20701. In his Complaint, the Plaintiff also alleges that the Railroad failed to comply with the

5

provisions of 49 CFR § 229.45 and 49 CFR § 229.119 ( c) with respect to Locomotive NS 6729. [Docket No. 1, Complaint].

Defendant seeks summary judgment as to Plaintiff's claim under the Locomotive Inspection Act, arguing that Locomotive NS 6729 was not "in use" on the Railroad's line of road at the time of Plaintiff Michael Coleman's alleged "slip" on the exterior walkway of the locomotive on January 22, 2014 while conducting the required pre-departure inspection of the locomotive. Defendant also seeks judgment as to Plaintiff's claims that it violated 49 CFR § 229.45 and 49 CFR § 229.119( c).

## II.

Under Fed.R.Civ.Proc. 56, a party may seek summary judgment as to "all of any part thereof" of a claim. When considering a motion for partial summary judgment, the standard for of review for summary judgment motions is used. *See Wuliger v. Christie*, 310 F.Supp.2d 897 (N.D. Ohio 2004).

In 1986, the United States Supreme Court set forth the standard for summary judgment in a trilogy of cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Celotex v. Cartett*, 477 U.S. 317. 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Following this precedent and Fed.R.Civ.P. 56( c), the moving party is entitled to judgment as a matter of law when "[t]he pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact." Summary judgment is mandated against a party who has failed to establish an essential element of his or her case after adequate time for discovery. In such a

situation, there is no genuine issue of material fact as the failure to prove an essential fact renders all other facts irrelevant. *Celotex v. Cartett*, 477 U.S. at 322-323.

## III.

### A. The Locomotive Inspection Act

The Locomotive Inspection Act ("LIA") provides:

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances -
>
> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
> (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
> (3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701.

The LIA does not create an independent cause of action. Rather, a violation of the LIA is negligence *per se* under the Federal Employers Liability Act, commonly known as FELA. *Szekeres v. CSX Transportation, Inc.*, 617 F.3d 424, 427 (6th Cir. 2010).

To state a LIA claim, a plaintiff must demonstrate:

(1) the locomotive was **"in use"** during the time of the injury;
(2) the locomotive must be located on the defendant's railroad track at the time of the injury; and
(3) the condition of the locomotive created an unnecessary risk of injury.

*Munns c. CSX Transportation, Inc.*, 579 F.Supp.2d 924, 932 (N.D. Ohio 2008)

7

(emphasis added).

Determination of whether the locomotive was "in use" is dispositive. If the locomotive was not "in use," the LIA claim fails as a matter of law. *Stierwalt v. CSX Transportation, Inc.*, 2007 WL 3046456 at *4 (N.D. Ohio 2007).

Although the parties agree that the LIA requires that a locomotive be "in use", they vehemently disagree as to whether the locomotive in this case was "in use" at the time Plaintiff sustained injury.

The Sixth Circuit has not squarely addressed this issue[1]. There is no controlling decision setting forth the proper analysis by which to determine if a locomotive is "in use." There are however, a smattering of opinions from District Courts within the Sixth Circuit. In *Stierwalt*, for example, a locomotive that had broken down while underway was regarded as "in use" as it had been released for, and had been in service until the breakdown. *Id.* Similarly, a railcar parked on an extension track leading to the main line and awaiting imminent departure was held to be in use. *Rogers v. Norfolk Southern Railway Company*, 2015 WL 4191147 (N.D. Ohio 2015). However, a locomotive within the wash track area of a train service shop was not "in use" for the purposes of the LIA. *McCool v. Norfolk Southern Railway Corporation*, 950 F.Supp.2d 939 (N.D. Ohio 2013).

As Chief Judge Carr, from the Norther District of Ohio, noted in *Stierwalt v. CSX*, '[d]etermining whether a locomotive is 'in use' is not always a straightforward exercise."

---

[1] The issue of what constitutes "in use" was presented to the Sixth Circuit in *Rogers v. Norfolk Southern Railway Company*, 126 Fed. Appx. 694 (6th Cir.). However, as the determination of liability in that case was supported by a jury's finding of negligence under the Federal Appliances Safety Act, the Court noted that a ruling as to the "in use" issue was unnecessary. *Id.*

*Stierwalt,* 2007 WL 3046456 at *4 (internal citation omitted). "To be sure, a locomotive pulling a train on a main line is "in use," and a locomotive in a repair shop for servicing is not "in use'." *Id.* Yet, for the gray areas, there is no bright line test separating "in use" and not "in use", as evidenced by the conflicting opinions in other circuits. Indeed, only in the labyrinth of the law, where words are often stretched, strained and tortured beyond recognition, it is possible for a locomotive to be "in use" even though it is motionless and not on the main track. *Stierwalt,* 2007 WL 3046456 at *4 (internal citation omitted).

However, without wading into the muck of myriad analyses outside this circuit, the undersigned finds basis upon which to decide the "in use" conundrum based upon the undisputed facts of this case. The 99 railcars loaded with coal, which were coupled to three locomotives, were tied down on siding. [Docket No. 40-5, Deposition of Michael Coleman at p.316]. They had sat, motionless, for at least 8 hours prior to Plaintiff's arrival. *Id.* at 183-184. Plaintiff could not operate the locomotives and pull the coal-filled cars until the handbrakes on the locomotives and the brakes on the railcars had been released. At the time he sustained injury, he had not completed the pre-departure inspections. [Docket No. 39-6, Deposition of Derek Erwin, p. 58]. Nor had Plaintiff or Erwin been given permission to move the locomotives and/or the cars from the siding to the branch line. [Docket No. 39-6, Deposition of Bill Honeycutt, p. 258]. The locomotives were not moving, nor were they ready to move away from the remote siding. Based upon the undisputed facts, it cannot credibly be said that these locomotives were "in use."

Plaintiff maintains otherwise. He argues that two facts warrant a conclusion that the subject locomotive was "in use." First, he agues that the locomotive was not undergoing

9

scheduled service or repair and, as such, was "in use." Second, he contends that because on the day of the incident, he was a transportation employee, as opposed to a mechanic and that this, somehow, precludes a finding that the locomotive was "in use." Yet, this two factor analysis ignores other, obvious facts, such as the fact that these cars had been motionless, tied to a remote siding, for at least eight hours prior to Plaintiff's arrival and that, at the time he sustained injury, the cars had not been cleared for departure.

Plaintiff's unduly narrow view also seems out of step with the purpose of the LIA, which affords the railroad an opportunity to have its locomotive engineer or other employee inspect for any defects or unsafe conditions prior to placing the locomotive in use on the railroad's line of road without being exposed to strict liability for such conditions. *See Stierwalt*, 2007 WL 3046456 at *4 (internal citation omitted).

Finally, in an attempt to avoid summary judgment, Plaintiff urges that factual issues abound. Yet the facts he emphasizes have no relevance to the issue of whether the locomotive in question was "in use" for the purposes of the LIA.

Moreover, both parties agree that whether a locomotive is "in use" is a question of law to be decided by the trial court judge. *Id.*

### B. 49 C.F.R. §§ 229.45 and 229.119( c)

In Paragraphs 17(l-n), Plaintiff alleges that NSRC failed to comply with certain Locomotive Safety Standards, as codified in 29 C.F.R. Part 229. Specifically, that contends that NSRC ran afoul 49 C.F.R. §§ 229.45 and 229.119( c) because there was snow on some of exterior walkways of the locomotives at the time Plaintiff arrived at Burke.

49 C.F.R. § 229.45 refers to the general condition of locomotives:

10

> All systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train. These conditions include: insecure attachment of components, including third rail shoes or beams, traction motors and motor gear cases, and fuel tanks; **fuel, oil, water, steam, and other leaks** and accumulations of oil on electrical equipment that create a personal injury hazard; improper functioning of components, including slack adjusters, pantograph operating cylinders, circuit breakers, contactors, relays, switches, and fuses; and cracks, breaks, excessive wear and other structural infirmities of components, including quill drives, axles, gears, pinions, pantograph shoes and horns, third rail beams, traction motor gear cases, and fuel tanks.

49 C.F.R. § 229.45 (emphasis added).

Plaintiff contends that the presence of snow on the exterior walkways of NS 6729 violated this regulation, suggesting that naturally occurring precipitation such as rainwater and snow fall within the portion of the regulations prohibiting "fuel oil, water, steam, and other leaks..." on locomotives used on the railroad's line of road. And we arrive at the labyrinth once again. Plaintiff's argument that naturally occurring snow, rainwater, or sleet which falls from passing clouds during inclement weather constitute "other leaks" referenced in the regulation is, at best, a strained and illogical. Nor is there case law or legislative history which supports his definition of "other leaks."

Section 229.119( c) provides:

> Floors of cabs, passageways, and compartments shall be kept free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard. Floors shall be properly treated to provide secure footing.

49 C.F.R. § 229.119( c).

11

This regulation pertains "cabs, passageways and compartments", all areas which are located in interior areas of the locomotive. There is absolutely no mention of exterior walkways in this regulation. Moreover, there is no mention in this regulation of any requirement that the railroad keep locomotive exterior walkways (which do not have a roof and are open to the elements and precipitation) completely free of naturally occurring precipitation such as rainwater, snow, ice or sleet.

Notably, Plaintiff's liability expert witness, Michael O'Brien, candidly admitted the word "walkways" does not appear in the title or the text of this regulation. [Docket No. 39-10, Deposition of Michael O'Brien, p. 283-285].

Based upon the plain reading of the regulations, precipitation is not within their purview. Therefore, Plaintiffs claim that NSRC violated these regulations is without merit.

Plaintiff's contention that the locomotives were unsafe and even treacherous, begs the question of why he failed to report these conditions and why he proceeded to board, work on and attempt to operate them. Indeed, NSRC's Operating Rules speak to this directly:

> Employees must not do any work in a manner that will jeopardize their own safety or the safety of others. They must know that appliances, tools, supplies, and facilities used in performing their duties are in proper condition. If not, they must have them repaired or replaced before using them. It is the duty of every employee to examine them to determine their condition.

[Docket No. 39-7, Portions of Operating Rules].

Yet, Plaintiff chose to disregard this Rule and board the equipment he now claims was "treacherous." Instead notifying the Railroad via radio or phone of the allegedly defective condition of the locomotives, and awaiting his supervisor's instructions with respect to handling,

12

the Plaintiff grabbed his personal gear and his travel bag, and dismounted from the pusher unit. [Docket No. 36-2, Deposition of Michael Coleman, p. 243]. He Plaintiff climbed the steps of the lead locomotive, NS 6706, walked down the walkway, and entered the cab of the lead locomotive, the NS 6706, without incident although he now describes the locomotive steps as snow and ice covered and "treacherous".

## IV.

Plaintiff has not come forward with any credible evidence creating a genuine issue of material fact that locomotive NS 6729 was "in use" on the Railroad's line of road at the time of his alleged slip on an exterior walkway of the locomotive on January 22, 2014 and has provided no admissible evidence creating a genuine issue of material fact to support his contention that NSRC violated the provisions of the Federal Locomotive Inspection Act, 49 U.S.C. § 20701, or the federal regulations codified at 49 CFR § 229.45 and 49 CFR § 229.119( c). He has failed to prove essential elements of these claims.

However, the Court hereby finds, pursuant to 28 U.S.C. § 1292(b) that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of this litigation.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Norfolk Southern Railway Company's Motion for Partial Summary Judgment Seeking Dismissal of Plaintiff's Claims under the Locomotive Inspection Act, 49 U. S. C.§ 20701 and claims asserting alleged violations of the federal regulations codified at 49 CFR § 229.45 and 49 CFR § 229.119( c) [Docket No. 39] be **SUSTAINED**.

**IT IS FURTHER ORDERED** that this action is **STAYED** until such time as the Sixth Circuit Court of Appeals either has declined to accept an interlocutory appeal or appellate proceedings before that Court have fully concluded.

This 18th day January, 2018.



Signed By:
*Henry R. Wilhoit, Jr.*
**United States District Judge**